IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAMES C. WENZLER,

                    Plaintiff,                              OPINION and ORDER

        v.
                                                           23-cv-170-jdp
U.S. COAST GUARD and KEVIN E. LUNDAY,

                    Defendants.

---

The United States Coast Guard Auxiliary consists of volunteers who support Coast Guard missions. *See* 14 U.S.C. §§ 3901–13, 4101–04. Proceeding without counsel, plaintiff James C. Wenzler alleges that defendants disenrolled him from the Auxiliary based on his speech on social media. I allowed Wenzler to proceed on Administrative Procedures Act (APA) and First Amendment retaliation claims for injunctive relief. Dkt. 27 and Dkt. 31.

Four motions are pending. Wenzler moves for sanctions for spoliation of evidence and to compel the disclosure of certain documents. Dkt. 67 and Dkt. 68. I will deny the motion for sanctions because defendants did not lose any text messages related to Wenzler's disenrollment when two government employees' phones were reset upon their retirement. I will deny the motion to compel because Wenzler did not confer in good faith with defendants' counsel before filing it and the attorney-client privilege protects the documents at issue from disclosure.

The main subject of this opinion are the parties' motions for summary judgment. Defendants move for summary judgment on Wenzler's APA and retaliation claims, and Wenzler cross-moves for summary judgment on the APA claim. Dkt. 104 and Dkt. 111. Wenzler's APA claim fails because defendants had at least a rational basis to conclude that there was cause to disenroll Wenzler from the Auxiliary based on his activity on social media

and other conduct, which included: misrepresenting his Auxiliary position on social media; refusing a direct order to update his social media account to conform with Auxiliary policies; disrespecting a superior officer in official correspondence; and making inflammatory comments on social media that discredited the Auxiliary and disrupted its operations. The retaliation claim fails because, for similar reasons, the First Amendment didn't protect Wenzler's social media posts. I will grant defendants' motion, deny Wenzler's cross-motion, and close the case.

BACKGROUND

**A.  Organization of the Auxiliary and authority to disenroll members**

The commandant of the U.S. Coast Guard administers the Auxiliary. 14 U.S.C. § 3901(a). The Auxiliary includes organizational elements and units that the commandant approves, including districts, regions, divisions, and flotillas. *Id.* Auxiliary members are not considered federal employees for most purposes, though the commandant may prescribe standards for the conduct and behavior of Auxiliary members. *Id.* § 3904(a). Auxiliary members may be disenrolled pursuant to applicable regulations. *Id.* § 3905. A member of the Auxiliary will be disenrolled, among other reasons, "for cause." 33 C.F.R. § 5.19.

The commandant has promulgated an Auxiliary Manual establishing policies and procedures for all Auxiliary members.[1] The Auxiliary Manual provides that membership may reasonably be expected to be sustained if an individual demonstrates, among other requirements, "commitment to and practice of the Coast Guard's core values[ of] Honor, Respect, and Devotion to Duty." Auxiliary Manual, ch. 3, § F.1.

---

[1] I will take judicial notice of Auxiliary Manual, COMDTINST M16790.1G, which was in effect when the events at issue occurred.

The commandant has delegated his authority to disenroll Auxiliary members to the director and chief director. *Id.* § H.5; *see also id.*, ch. 1, § B.10.b.(8). The director may disenroll an Auxiliary member for, among other reasons, "cause." *Id.* § H.5.a. The Auxiliary Manual defines "cause" as any infraction set forth in chapter three, §§ F, G, and H of the Manual, or any other action that, "in the Director's opinion," "has a disruptive impact that adversely affects the normal operations, administration, [or] functions. . .[of] the Auxiliary[ or] Coast Guard." *Id.* § H.5.a(4).

Appeals of disenrollment resulting from formal disciplinary action must be made in writing to the district commander within 30 days of the date of disenrollment. *Id.* § J.2.e. "The standard of review shall be limited to whether the prescribed disciplinary procedures were followed." *Id.*

## B.  Facts leading to Wenzler's disenrollment from the Auxiliary

The following facts are undisputed except where noted.

In May 2022, Wenzler held the office of vice flotilla commander, a leadership and management position. *See* Dkt. 74 at 15, 56. On May 13, 2022, the Auxiliary received a complaint from a member of the public about LinkedIn posts that she perceived as sexist, racist, and inappropriate, and that were apparently made by a Coast Guard employee in a human resources position. *Id.* at 61–62, 84–85. The posts were made by "Jim W.," whose profile showed him in an Auxiliary uniform and read "Branch Chief for Human Resources" for the Auxiliary. *Id.* The national branch chief of social media, Deborah Cordone, determined that Wenzler had made the posts. *Id.* at 84. The first was in response to a post congratulating Justice Ketanji Brown Jackson. *Id.* at 59. Wenzler's responsive post read: "Another racist makes the court to join racist Sotom[a]yor and Kag[a]n. Great job America!" The second post was in

response to a post commending a girl scout for writing a letter to the editor to complain about an announcement regarding boy and girl scouts that the writer deemed sexist. *Id.* at 60. Wenzler's responsive post read: "Well if you are proving you are just having fun, then you are. To find something sexist is to show you are the sexist. Perhaps the Girl Scouts should actually accomplish something, but alas they just sell cookies." *Id.* at 64.

The same day she received the complaint, Cordone emailed the complaint to the Auxiliary's national director of public affairs, Lourdes Oliveras. Oliveras forwarded the email to the district chief of staff officer for the Ninth District, Sonny Thatch II, and referred it to the Ninth District for "proper action on this serious matter." *Id.* at 83. Wenzler's flotilla was in the Ninth District. Thatch later forwarded the email to District Captain Peter Gapinski. *Id.* Thatch wrote: "I discussed with [District Commodore] Harvey [Randall] and the violations are pretty clear. I'm forwarding to you for resolution via a letter of caution." *Id.*

In mid-June 2022, Randall emailed Wenzler to notify him that a complaint had been made against him and that Randall was authorizing an investigation. Randall wrote that he had appointed Gapinski as the preliminary investigating officer (PIO), and he attached a notice of complaint to the email. In the notice of complaint, Randall identified two potential infractions of the Auxiliary Manual: (1) misrepresenting Coast Guard authority, rank, government title, or Auxiliary position or status, either implied or by design; and (2) failure to follow published Auxiliary web policies and guidelines. *Id.* at 50 (citing Auxiliary Manual, ch. 3, § G.1.h and j). Wenzler submitted a written response to the complaint to Randall and Gapinski, and he had further communications with Gapinski by telephone.

Later that month, Gapinski issued his PIO report. Gapinski found that when Wenzler made the LinkedIn posts, his profile showed him in an Auxiliary uniform and read: "Jim W. []

4

Branch Chief-Human Resources Directorate," "United States Coast Guard Auxiliary Madison, Wisconsin, United States." *Id.* at 23, 55. Gapinski noted that Wenzler told him that he had served in a human resources capacity for the Auxiliary in 2018. *Id.* at 23. Gapinski wrote that the incident appeared to violate Auxiliary Manual, ch. 5, § R.2, Unofficial Internet Posts. *Id.* at 25. Section R.2(a) says that auxiliarists engaged in unofficial internet posting must take steps to avoid giving the perception of posting in an official capacity. Gapinski wrote that after the complaint Wenzler changed his LinkedIn profile so that he appeared in civilian attire and identified himself as "Jim Wenzler, OMB." *Id.* at 23. But Gapinski recommended that a letter of caution "be considered so that [Wenzler] might further alter his profile 'to avoid giving the perception of posting in an official capacity.'" *Id.* at 25.

On July 15, 2022, Randall issued Wenzler a letter of caution pursuant to Auxiliary Manual, ch. 3, § G.2.e. *Id.* at 19–20. Randall found that Wenzler had misrepresented Auxiliary position or status and failed to follow published Auxiliary web policies and guidelines. *Id.* at 19. Randall directed Wenzler to immediately remove from his social media accounts any image of himself in Auxiliary uniform and any reference to any Auxiliary office held, and he expected him to provide evidence that he had taken those actions. *Id.* Wenzler emailed Randall that afternoon, writing: "I disagree with your fake Letter of Caution, and am going to file a complaint against you for your racist and bigoted action against me because I am White. I find your behavior reprehensible." *Id.* at 21.

In early August 2022, in response to Randall's request, Division Commander John McDonald checked whether Wenzler had complied with the letter of caution. McDonald found that Wenzler had made recent LinkedIn posts in which his profile showed him in an Auxiliary uniform and identified him as "Branch Chief-Human Resources Directorate."

5

*Id.* at 18. In one post, Wenzler referred to someone with the job title "Director of First Impressions" as "receptionist." *Id.* at 18, 26. In another, Wenzler said that a university's president-elect was diagnosed with cancer because she had done a "horrible job" at another university. *Id.* at 18, 27.

Two days later, McDonald asked Wenzler if he planned to comply with the letter of caution and Wenzler said no. Four days later, Gapinski submitted a supplemental PIO report to the director of the Ninth District, Commander James Gibson, documenting Wenzler's noncompliance with the letter of caution. Gapinski wrote that Wenzler had returned to using a profile picture of him in an Auxiliary uniform and "making inflammatory comments." *Id.* at 17. "This is causing confusion," Gapinski continued, "because he is perceived as being in charge of the Human Resources Directorate" even though he "had served at the National level of the Human Resources Directorate but never as the Director and for less than a year in 2018." *Id.* at 17, 29. Gapinski recommended that consideration be given to terminating Wenzler from the Auxiliary. *Id.* at 17. Wenzler says that he was a director in human resources at that time, but this dispute is immaterial.

On August 12, 2022, Gibson notified Wenzler that he was temporarily suspending him pending the outcome of a formal disciplinary process pursuant to Auxiliary Manual, ch. 3, § H.1–3. In the notice of intent to impose disciplinary action, Gibson listed four infractions: (1) showing a lack of respect for colleagues and Coast Guard policy in his July 15 response to Randall, and by refusing to comply with the Unofficial Internet Posts policy; (2) making "inappropriate and disrespectful" comments on LinkedIn while representing himself in uniform as an Auxiliary leader, which discredited the Coast Guard and Auxiliary; (3) misrepresenting himself as branch chief of the Auxiliary's human resources directorate; and (4) failing to follow

the commandant's Anti-Discrimination and Anti-Harassment Policy Statement. *Id.* at 15–16. Gibson notified Wenzler that he could provide a written response to Gibson within 30 days, or appeal the suspension within 20 days to another official. *Id.* at 13, 16.

That afternoon, Wenzler appealed his temporary suspension to the Ninth District's chief of prevention, Captain Matthew Dooris. In about two weeks, Dooris sent Wenzler a letter notifying him that his appeal of the temporary suspension was denied for substantially the same reasons that Gibson had provided in the notice of intent. *Id.* at 9. Dooris reminded Wenzler that could submit a written response to the notice of intent by September 12, 2022. *Id.*

On September 19, 2022, Gibson notified Wenzler that he was disenrolling him from the Auxiliary. *Id.* at 7. Gibson wrote that Wenzler hadn't submitted a written response, and that his decision was for the reasons in the notice of intent. *Id.*; *see also id.* at 72. Gibson notified Wenzler that he could appeal to Dooris within 30 days. *Id.* at 8.

Wenzler appealed. *Id.* at 4. Acting on behalf of District Commander Michael Johnston, Dooris notified Wenzler that he was denying the appeal for substantially the same reasons in the notices of intent and disenrollment. *Id.* at 1–3. Dooris also wrote that the prescribed disciplinary procedures had been followed, and that the decision was final. *Id.* at 1–2.

I will discuss additional facts as they become relevant to the analysis.

## ANALYSIS

### A. Discovery motions

Wenzler has filed two discovery motions. In the first motion, Wenzler requests sanctions under Federal Rule of Civil Procedure 37(e) based on the alleged deletion of text

messages from Gibson's and Dooris's work cellphones. Dkt. 67. In the second motion, Wenzler moves the court to order defendants to disclose documents withheld on grounds of attorney-client privilege, or to inspect those documents in camera. Dkt. 68.

I begin with the motion for sanctions. The basic rule is that Rule 37(e) authorizes an appropriate sanction for the loss of relevant electronically stored information, if the party failed to take reasonable steps to preserve it. *See* Fed. R. Civ. P. 37(e); *Freidig v. Target Corp.*, 329 F.R.D. 199, 207 (W.D. Wis. 2018). Defendants acknowledge that, pursuant to Coast Guard policy, Gibson's and Dooris's work cellphones were reset to factory settings upon their retirement, which precludes retrieval of text messages from those devices. Dkt. 82 ¶¶ 5–6. But Gibson and Dooris say that, shortly after Wenzler brought this action, they searched their work cellphones in response to litigation holds for text messages related to Wenzler's disenrollment, and that those searches revealed no related substantive text messages. Dkt. 81 ¶¶ 3–4; Dkt. 86 ¶¶ 3–4; *see also* Dkt. 80 ¶ 4. Gibson and Dooris also say that they relied on email and phone calls to have substantive communications related to the disenrollment. Dkt. 81 ¶ 6; Dkt. 86 ¶ 6. The chief litigation coordinator, Brian Judge, says that he would not have expected Gibson or Dooris to have any substantive communication about the disenrollment by text message and that, had that occurred, he would have expected them to preserve the text messages pursuant to official policy. Dkt. 80 ¶¶ 4–5. There is no evidence that defendants lost any relevant text messages by restoring Gibson's and Dooris's phones to factory settings. I will deny the motion for sanctions.

That leaves Wenzler's motion to compel, which fails for procedural and substantive reasons. Regarding procedure, Wenzler failed to confer with defendants' counsel, Leslie Herje, before filing the motion even though the court had previously informed him of this

requirement. *See* Fed. R. Civ. P. 37(a)(1); Dkt. 59. Shortly after producing a supplemental privilege log, Herje informed Wenzler that she had inadvertently produced some privileged documents and planned to claw them back. Dkt. 83-5. The next day, Herje proposed to meet and confer in five or six calendar days, and Wenzler indicated that he was willing to have the meeting in six calendar days. Dkt. 83-6. But Wenzler moved to compel just one day later. Dkt. 68. Wenzler did not make a good-faith effort to confer with Herje before seeking court intervention.

Regarding substance, "attorney-client privilege protects communications made in confidence by a client and a client's employees to an attorney, acting as an attorney, for the purpose of obtaining legal advice." *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010). "The fact that the privilege is invoked to protect communications made by employees of a governmental entity rather than a private party does not change the analysis." *Id.* at 620. Defendants produced a final supplemental privilege log. Dkt. 83-8. They contend that the remaining documents are protected by the attorney-client privilege because they involve internal drafts and communications between Coast Guard employees and agency counsel for the purpose of providing legal advice, and their document descriptions support that contention. *See id.* Defendants have made a preliminary showing that the attorney-client privilege applies to these documents, and Wenzel has not shown any reason to doubt the accuracy of the privilege log. I will deny Wenzler's motion to compel.

## B. Motions for summary judgment

### 1. Wenzler's APA claim

Both parties seek summary judgment on Wenzler's APA claim. The APA "provides a right to judicial review of all final agency action for which there is no other adequate remedy

in a court." *See Bennett v. Spear*, 520 U.S. 154, 175 (1997); 5 U.S.C. § 704. In an action for review of final agency action, "the ultimate question is whether that action is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Mittelstadt v. Perdue*, 913 F.3d 626, 633 (7th Cir. 2019) (quoting 5 U.S.C. § 706(2)). The court's review is deferential; it "simply ensures that the agency . . . has reasonably considered the relevant issues and reasonably explained the decision." *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 75 F.4th 743, 749 (7th Cir. 2023); *see also Gripum, LLC v. U.S. Food & Drug Admin.*, 47 F.4th 553, 558 (7th Cir. 2022) ("To meet the APA's arbitrary-and-capricious standard, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."). The agency's factual findings must be supported by substantial evidence. *Brousil v. U.S. Dep't of Lab., Admin. Rev. Bd.*, 43 F.4th 808, 811 (7th Cir. 2022) (citing 5 U.S.C. § 706(2)(E)). This standard is also deferential: it is satisfied if the factfinder "relied on such relevant evidence as a reasonable mind might accept as adequate to support the conclusion." *Id.*

In evaluating the agency's action, the court must take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706. An agency's error is harmless if it clearly "had no bearing on the substance of its decision." *See Prohibition Juice Co. v. U.S. Food & Drug Admin.*, 45 F.4th 8, 24 (D.C. Cir. 2022); *cf. Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record . . . . , then remanding is a waste of time."). The party challenging the agency's action has the burden of showing that an error is harmful. *See Shinseki v. Sanders*, 556 U.S. 396, 406–07, 409 (2009).

Gibson's decision to disenroll Wenzler from the Auxiliary was not arbitrary and capricious and was supported by substantial evidence.

Cause for disenrollment includes failing to apply and adhere to Coast Guard core values "in the conduct of Auxiliary programs," and respect is a core value. Auxiliary Manual, ch. 3, §§ F.1, 3.H.1.a. Gibson found that Wenzler's July 15 email response to Randall showed a lack of respect. In that email, Wenzler characterized the letter of caution as "fake," said that Randall's actions were "reprehensible," and accused Randall of racism and bigotry. Even if Randall's findings were erroneous, that error did not warrant a scornful and discourteous response. Gibson also found that Wenzler's refusal to comply with the Unofficial Internet Posts policy showed a lack of respect. Randall had directed Wenzler to remove from LinkedIn any image of himself in Auxiliary uniform and any reference to any Auxiliary office held, but he failed to comply with this direct order. Dkt. 74 at 18, 26–29. Wenzler refused a direct order and made scornful and discourteous remarks to a superior in official correspondence about Auxiliary policies. Gibson rationally concluded that Wenzler had demonstrated a lack of respect for Coast Guard policy "in the conduct of Auxiliary programs."

Cause for disenrollment also includes any action that, in Gibson's opinion, "has a disruptive impact that adversely affects the normal operations, administration, [or] functions. . . [of] the Auxiliary[ or] Coast Guard." Auxiliary Manual, ch. 3, § H.5.a(4). As I've noted, this "catch-all provision [gave Gibson] broad discretion to disenroll [Wenzler] for actions that he deem[ed] to disrupt and adversely affect the Auxiliary's functioning." *See* Dkt. 27 at 12. It was rational to conclude that the catch-all provision includes the second and third infractions in Gibson's notice of intent: (2) making "inappropriate and disrespectful" comments on LinkedIn

while representing himself in uniform as an Auxiliary leader, and (3) misrepresenting himself as branch chief of the Auxiliary's human resources directorate.

In his social media posts, Wenzler misrepresented his position as "Branch Chief-Human Resources Directorate." And he made disrespectful comments in which he: called Supreme Court Justices racists; called a girl scout sexist and mocked her for selling cookies; demeaned a social media user based on her occupation; and celebrated the cancer diagnosis and subsequent resignation of a university's president-elect. Dkt. 74 at 26–27, 59, 64. In response to the first two posts, a member of the public complained that an apparent Coast Guard employee in a human resources position was making comments that she perceived as sexist, racist, and inappropriate. In response to the post about the university's president-elect, a LinkedIn user wrote: "[J]ust looking for confirmation, you put THIS guy in charge of human resources?" Dkt. 74 at 28. There was a rational basis for Gibson to conclude that Wenzler's actions on social media disrupted and adversely affected the Auxiliary's and Coast Guard's functioning, including by discrediting those agencies in the eyes of the public. *Cf.* Auxiliary Manual, ch. 3, § F ("Certain offenses are so unacceptable that they may cause serious discredit to the organization's core values and warrant disenrollment as a disciplinary action.").

Wenzler says that defendants committed at least 25 violations of Auxiliary and Coast Guard policies, which he contends shows that the decision to disenroll him was arbitrary and capricious and otherwise unlawful under the APA. *See, e.g.*, Dkt. 131 at 2, 16–21, 23, 28. Some of Wenzler's arguments are not clearly articulated. Some lack citations to relevant, admissible evidence. Other arguments reflect a misreading of the Auxiliary Manual or a mischaracterization of evidence. Wenzler also raises arguments that are outside the scope of

the claims on which I allowed him to proceed. Nevertheless, I will address what appear to be Wenzler's main points.

Wenzler suggests that he had a protected property interest under the Due Process Clause in Auxiliary membership because he paid dues, including for the insignia that he displayed on his LinkedIn profile. *See* Dkt. 131 at 6–10. I didn't allow Wenzler to proceed on a due process claim on screening the complaint, Dkt. 27 at 8–10, and this argument is a latecoming attempt to circumvent that ruling. *See Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). In any case, Wenzler hasn't shown that he had a protected property (or liberty) interest in Auxiliary membership considering that he held a volunteer position that was subject to wide discretion in terms of disenrollment and other personnel decisions. *See, e.g.*, Auxiliary Manual, ch. 3, § F.1; *see also Verbil v. U.S. Coast Guard*, 683 F. App'x 600 (9th Cir. 2017). Even if Wenzler had such an interest in Auxiliary membership, the administrative record shows that he substantially received the "minimal due process protections" required. *See* Auxiliary Manual, ch. 3, § F.1.

Wenzler says that, on its face, the Unofficial Internet Posts Policy didn't apply to his LinkedIn posts because he wasn't discussing Coast Guard matters. Dkt. 131 at 14. Under that policy, "[u]nofficial internet posts refer to Auxiliarists who express their Coast-Guard related thoughts, ideas, knowledge, experience, and opinions by posting any Coast Guard-related information to any . . . internet site." Auxiliary Manual, ch. 5, § R.2. But Wenzler's profile showed him in Auxiliary uniform when he made the posts, and he represented that he held a leadership position in human resources. It was rational for Gibson to conclude that Wenzler had failed to "take steps to avoid giving the perception of posting in an official capacity." *See id.*

13

It was also rational for Gibson to conclude that Wenzler was expressing Coast Guard-related experience, information, and opinions given his self-identification as a Coast Guard leader.

Wenzler says that the notice of complaint was too vague to notify him of its factual basis. *See* Dkt. 131 at 13. But the notice summarized the public member's complaint and identified the provisions of the Auxiliary Manual that Wenzler's activity on social media could have violated. Dkt. 47 at 50. Wenzler's detailed response to the complaint, in which he refers specifically to his activity on LinkedIn, further belies the notion that it was too vague to respond. *See id.* at 42–47.

Wenzler says that Gapinski was biased because Thatch told Gapinski that Thatch thought the violations were "pretty clear" when he notified Gapinski of the initial complaint. Dkt. 74 at 83; Dkt. 131 at 13. Thatch's remark that the violations of Coast Guard policy were "pretty clear" doesn't show that Gapinski failed to exercise independent judgment as an investigator. Gapinski's initial and supplemental PIO reports, which detail his efforts to investigate the complaint, refute the idea that he failed to conduct an independent investigation. *See id.* at 17, 23.

Wenzler suggests that he corrected any violation of the Unofficial Internet Posts policy by changing his LinkedIn profile page to "Jim Wenzler, OMB." Dkt. 74 at 37. But, at that time, Wenzler continued to misrepresent his position as "Branch Chief-Human Resources Directorate." *Id.* Wenzler hadn't served in a human resources capacity since 2018. In any case, Wenzler returned to using a profile picture in Auxiliary uniform and misrepresenting that he held a leadership position in human resources. Wenzler also says that he corrected any violation of that policy by including the disclaimer "All opinions are mine and mine alone" in the About section of his LinkedIn homepage. Dkt. 74 at 37. But that doesn't change the fact

that Wenzler's profile showed him in an Auxiliary uniform and misrepresented his position when he made the third and fourth posts.

Wenzler says that Dooris mishandled his appeal of Gibson's decision to disenroll him. Wenzler notes that Dooris asked Gibson to prepare a draft denying the appeal, which he contends shows that Dooris failed to conduct a complete review in consultation with agency counsel. Dkt. 131 at 20 (citing Auxiliary Manual, ch. 3, § J.2.c.). I will consider the email chain that Wenzler cites even though it is outside the administrative record. Dkt. 123-5. By itself, Gibson's preparation of a draft decision does not prove that Dooris violated § J.2.c. This section limits the standard of review "to whether prescribed disciplinary procedures were followed." In his decision, Dooris sets forth the correct standard and writes that he found that those procedures had been followed. Dkt. 74 at 1; Dkt. 107 ¶ 27. That Gibson provided substantive information about the reasons for disenrollment does not show otherwise. And Dooris consulted with agency counsel before deciding the appeal, *see* Dkt. 83-8, which further indicates that his decision was independent.

Even if Dooris violated § J.2.c., I must consider whether the error was harmless. The record overwhelmingly supports Gibson's decision to disenroll Wenzler. The administrative record clearly shows that Wenzler received notice of, and a full opportunity to respond to, the initial complaint and supporting documents, letter of caution, and notice of intent. It's equally clear that Gibson had at least a reasonable basis to find that Wenzler's activity on social media and correspondence with superior officers violated Auxiliary and Coast Guard policies. The evidence conclusively shows that Wenzler: (1) misrepresented his Auxiliary position on LinkedIn; (2) refused a direct order to comply with social media policy and made scornful and discourteous remarks to a superior in official correspondence; and (3) disrupted Auxiliary

15

operations and discredited the Auxiliary and Coast Guard by making offensive remarks on social media while appearing in uniform and misrepresenting himself as a leader in human resources. Considering the broad discretion that Gibson has to make disenrollment decisions for cause, I can say with great confidence that the Auxiliary would reinstate the decision to disenroll Wenzler on remand. The other minor procedural errors that Wenzler describes are harmless for the same reasons.

I will grant defendants' motion for summary judgment on Wenzler's APA claim, and I will deny Wenzler's cross-motion for summary judgment on that claim.

### 2.    Wenzler's First Amendment retaliation claim

I begin by clarifying the basis of Wenzler's retaliation claim. Initially, I did not allow Wenzler to proceed on a retaliation claim because he failed to describe the posts or complaints in his pleading. Dkt. 27 at 8. Wenzler moved for reconsideration, identifying the social media posts on which he based the retaliation claim, which had been attached to a prior brief. Dkt. 28 (citing Dkt. 21-2). I then allowed Wenzler to proceed on a retaliation claim based on the allegation that defendants disenrolled him because of posts he made on LinkedIn. Dkt. 31.

In his opposition brief, Wenzler suggests that he was retaliated against based in part on complaints that he made during the disciplinary process. *See* Dkt. 131 at 2, 16, 29. But in the order, Dkt. 31, I did not allow Wenzler to proceed on a retaliation claim based on complaints that he made during the disciplinary process. Wenzler could have, but did not, seek reconsideration of that ruling. I will not consider the new theory of relief that he faced retaliation based on complaints he made during the disciplinary process, which is poorly developed at this late stage. *See Anderson*, 699 F.3d at 997. I will consider only whether defendants retaliated against Wenzler based on his LinkedIn posts.

16

Even though Wenzler was a volunteer for the Auxiliary, not an employee, I must evaluate his retaliation claim under the framework that applies to public employees' speech. *See Harnishfeger v. United States*, 943 F.3d 1105, 1110–13 (7th Cir. 2019); *Mosely v. Bd. of Educ. of City of Chicago*, 434 F.3d 527, 533–35 (7th Cir. 2006). Wenzler disagrees that this framework applies, relying on *Sheppard v. Beerman*, 94 F.3d 823 (2d Cir. 1996). Dkt. 131 at 3. But *Sheppard* is not the law in this circuit. *See* Dkt. 137 at 3–4; *see also Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004) ("[D]istrict judges must follow the decisions of this court . . . .").

Determining whether a public employer's personnel decision infringed an employee's First Amendment rights involves three primary steps: "Public employees must present evidence that (1) their speech was constitutionally protected; (2) they suffered a deprivation likely to deter free speech; and (3) their speech was at least a motivating factor in the employer's actions." *Hicks v. Ill. Dep't of Corr.*, 109 F.4th 895, 900 (7th Cir. 2024) (alteration adopted). There's no real dispute about the second and third elements. But the first element is decisive here.

To determine whether a public employee's speech is protected, courts apply the two-step test from *Connick v. Myers*, 461 U.S. 138 (1983) and *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968). "The first step asks whether the employee spoke as a citizen upon matters of public concern, as opposed to as an employee upon matters only of personal interest." *Hicks*, 109 F.4th at 900. A public employer is generally free to regulate an employee's speech on matters of only personal interest. Wenzler doesn't make a compelling showing here, because his posts are purely personal comments about perceived sexism, racism, and incompetence. They convey only his disdain, without adding any

17

genuine information or insight pertinent to the functioning of public institutions. Compare Wenzler's comments with those cited in *Connick*. 461 U.S. at 147–48. Despite the poor showing at this step, the court will proceed to the second step.

The second step, referred to as *Pickering* balancing, "asks whether the employee's interests in speaking on a matter of public concern outweigh the government's interest in promoting effective and efficient public services." *Hicks*, 109 F.4th at 900. At the second step, courts consider: (1) whether the speech would interfere with discipline, operations, or relationships among coworkers; (2) whether personal loyalty and confidence are necessary to the employment relationship; (3) whether the speech impeded the employee's ability to perform his responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one for which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public. *Id.* at 901–02. The court need not apply each factor, and "one factor of great weight may offset several which lean slightly in the other direction." *See id.* at 901–04. The first factor is "often determinative." *Volkman v. Ryker*, 736 F.3d 1084, 1092 (7th Cir. 2013). "A government employer need not prove that the employee's speech actually disrupted efficiency; rather, the employer's burden is to show the potential disruptiveness of the employee's speech." *Hicks*, 109 F.4th at 902.

The evidence shows that the Auxiliary's interests in promoting effective and efficient public services outweighed any interest Wenzler had in making the LinkedIn posts. Regarding the first factor, Gibson says that Wenzler's "inappropriate and disrespectful social media comments, as made by an Auxiliarist in a supervisory position . . . , could set a bad example for other Auxiliarists." *See* Dkt. 108 ¶ 17. Furthermore, the LinkedIn posts created "adverse public

exposure" for the Auxiliary, which "threatened to erode community trust and impair its operations." *See Hicks*, 109 F.4th at 902; *see also* Dkt. 108 ¶ 17 ("[Wenzler's social media comments] . . . could . . . tarnish the Auxiliary's reputation in the public and hamper recruiting efforts."). As discussed, in response to the first two posts, a member of the public complained that an apparent Coast Guard employee in a human resources position was making comments that she perceived as sexist, racist, and inappropriate, and another LinkedIn user expressed disbelief that Wenzler could head human resources yet celebrate someone's cancer diagnosis. Wenzler's social media activity led to a lengthy disciplinary process, further disrupting the Auxiliary's normal operations. The first factor strongly favors defendants.

The second factor, whether personal loyalty and confidence are necessary to the employment relationship, favors defendants given the Auxiliary's close connection to the Coast Guard. "The Coast Guard is a military service and is a component of the U.S. Armed Forces." Auxiliary Manual, ch. 1, § A.3. Even though the Auxiliary is non-military, it "is a component of Coast Guard Forces" and may be "included under the general organizational umbrella of the Coast Guard." *Id.* For purposes of *Connick/Pickering* balancing, the Auxiliary is analogous to a "paramilitary organization." *Cf. id.* at 901–02. In the paramilitary context, courts give "considerable deference to the government employer's assessment of the risks that employee speech creates," and the employer receives "more latitude in [its] discipline decisions and personnel regulations than an ordinary government employer." *Id.* at 902.

The third factor, whether the speech interfered with the employee's responsibilities, also favors defendants, though by a smaller margin. I will accept that Wenzler was otherwise performing his duties admirably when he made the LinkedIn posts. But Wenzler was a vice flotilla commander, and "[s]upervisors are tasked with enforcing rules and regulations." *See id.*

at 903. Wenzler's initial social media posts refer to certain Supreme Court Justices as "racists" and a girl scout "sexist" for reasons that are unclear; Wenzler hasn't explained why he used those terms. Those two posts "support the conclusion that [Wenzler] is not an impartial decisionmaker, [and that] staff . . . may grow wary of working with him or following his orders." *See id.* Gibson's finding that Wenzler failed to follow the Anti-Discrimination and Anti-Harassment Policy Statement supports the inference that his social media posts could lower staff's confidence in his impartiality. The other posts, in which Wenzler demeans a receptionist and celebrates someone's cancer diagnosis, raise similar concerns about his impartiality.

The fourth factor, the time, place, and manner of the speech, also supports defendants. Wenzler stresses that he made the posts on his private LinkedIn account while off duty, but "any member of the public or [Auxiliary] could have [and did] come across them." *See id.* Furthermore, though I have accepted that Wenzler spoke on matters of public concern when he made the posts, it's unclear how they contributed "something of value to public discourse." *See id.* Wenzler's posts "were mocking, derisive, and juvenile." *See Schneiter v. Carr*, No. 21-cv-135-jdp, 2022 WL 1773484, at *5 (W.D. Wis. June 1, 2022). They "do not evince any attempt to have a serious debate on political issues; rather, they seem designed to only belittle [others] and [perhaps] inflame those who hold opposing views." *See id.* Wenzler hasn't explained how the posts added to public discourse; he only broadly says that he was commenting on "topics of business, social and public concern" and "political . . . content." Dkt. 131 at 1–2.

Following the approach taken in *Hicks*, I will not address the fifth and sixth factors because the other factors strongly favor defendants. The seventh factor asks whether the speaker should be regarded as a member of the general public. When Wenzler made the posts,

his profile picture showed him in Auxiliary uniform, and he misrepresented that he was a leader in human resources for the Auxiliary. Those steps "made it easy" to identify Wenzler as a member of the Auxiliary and "created the risk" that someone would associate his posts with that agency, which at least two LinkedIn users did. *See Hicks*, 109 F.4th at 903–04. The seventh factor favors defendants.

The *Pickering* factors weigh heavily in favor of defendants. No reasonable juror could conclude that Wenzler's LinkedIn posts were constitutionally protected. I will grant summary judgment to defendants on Wenzler's retaliation claim. Because I have granted summary judgment to defendants on Wenzler's APA and retaliation claims, the entire case will be dismissed.

## ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 104, is GRANTED.

2. Plaintiff's cross-motion for partial summary judgment, Dkt. 111, is DENIED.

3. Plaintiff's motion for sanctions and motion to compel, Dkt. 67 and Dkt. 68, are DENIED.

4. The clerk is directed to enter judgment and close the case.

Entered May 19, 2025.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge